**STATE OF NEW MEXICO, ex rel. Tom UDALL, Attorney General, Plaintiffs,**

**Natural Resources Defense Council, et al., and State of Texas, ex rel. Dan Morales, Attorney General, Plaintiffs–Intervenors,**

v.

**James D. WATKINS, Secretary of the Department of Energy, et al., Defendants.**

**ENVIRONMENTAL DEFENSE FUND, et al., Plaintiffs,**

v.

**James D. WATKINS, Secretary of the Department of Energy, et al., Defendants.**

**Civ. A. No. 91–2527, 91–2929.**

United States District Court, District of Columbia.

Feb. 3, 1992.

Bernhardt Wruble, Washington, D.C., for plaintiffs.

Michael Reed, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

These consolidated cases are before the Court on summary judgment motions. In *New Mexico v. Watkins*, Civil Action No. 91–2527, defendants Department of Energy, et al. ("DOE"), and plaintiff-intervenors, Natural Resources Defense Council, et al. ("NRDC") have filed cross motions for summary judgment. In *Environmental Defense Fund v. Watkins*, Civil Action No. 91–2929, plaintiffs Environmental Defense Fund, et al. ("EDF") move for summary judgment.

## I.

Briefly, the facts are as follows. This controversy involves a DOE project entitled the Waste Isolation Pilot Program, ("WIPP"). The WIPP came about as the result of a search for a geologically acceptable repository for DOE generated nuclear and hazardous waste. It is located in 200 million year old salt beds, 26 miles southeast of Carlsbad, New Mexico, on 10,240 acres of the public lands. In 1979, Congress authorized withdrawal of what would become the WIPP site for the purpose of "providing a research and development facility to demonstrate the safe disposal of radioactive wastes resulting from federal defense activities and programs." Pub.L. No. 96–164, section 213, 93 Stat. 1259, 1265–66 (1979).

In 1982, the Secretary of Interior withdrew the WIPP site, pursuant to his authority under the Federal Land Policy and Management Act, 43 U.S.C. section 1701, *et seq.*, for research and development, pending a legislative withdrawal. Public Land Order No. 6232.

In 1983, the DOE obtained a new withdrawal of the WIPP site to begin the construction phase. Public Land Order 6403, 48 Fed.Reg. 31,038 at 3878. The withdrawal order prohibited the transportation, storage or burial of any radioactive materials.

In 1989, the DOE sought to "modify and extend" existing Public Land Order 6403. Specifically, the DOE's application sought to change the purpose of the previous withdrawal to allow a test program by the DOE which would introduce "retrievable radioactive waste" at the site. 54 Fed.Reg. 15815. The application was granted on January 22, 1991 by Public Land Order No. 6826. On October 9, 1991, New Mexico brought suit for declaratory and injunctive relief seeking to enjoin defendants from proceeding with the test phase of the latest withdrawal.[1] Plaintiff also filed a motion for preliminary injunction at that time. On November 26, 1991, the Court entered a preliminary injunction enjoining the defendants from proceeding under the January 22, 1991 withdrawal pending resolution of the consolidated matters. The summary judgment motions presently before the Court concern the January 22, 1991 withdrawal.

## II.

The motions for summary judgment in the consolidated cases present two distinct issues. In *Environmental Defense Fund v. Watkins*, Civil Action No. 91–2929, the Court must address whether the WIPP site has interim status to proceed with its test phase under the Resource Conservation and Recovery Act ("RCRA"). In *New Mexico v. Watkins*, Civil Action No. 91–2527, the Court must address whether the defendants have violated the Federal Land Policy and Management Act ("FLPMA"). The

Court will address these issues separately after a discussion of the law applicable to summary judgment motions.

## III.

Summary judgment is proper where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment, must prove the lack of any genuine issue of fact. The Court must view the available facts in the light most favorable to the non-movants. *Minihan v. American Pharmaceutical Ass'n*, 259 U.S.App.D.C. 10, 812 F.2d 726, 727 (1987). Although the burden on the party opposing a motion for summary judgment is not great, the party is still "required to show specific facts as opposed to general allegations, that present a genuine issue worthy of trial." 10A Wright & Miller, Federal Practice & Procedure § 2727 (2d ed. 1983). Non-movants may respond by arguing that the evidence proffered by the movants raises a fact issue which must be resolved at trial. Under this standard, facts asserted by the party opposing the motion if supported by affidavits or other evidentiary material, are regarded as true. *Id.*

In making its inquiry on a summary judgment motion, "the court has the power

---

1. The Court granted motions by Natural Resources Defense Council, et al. and the State of Texas to intervene as additional plaintiffs in

*New Mexico v. Watkins,* Civil Action No. 91–2527.

to penetrate the allegations of fact in the pleadings and look at any evidential source to determine whether there is an issue of fact to be tried." *Palestine Information Office v. Shultz*, 272 U.S.App.D.C. 1, 853 F.2d 932, 944 (1988) (*quoting Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir.1972)). *First Nat. Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569, *reh'g denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968).

### IV.

In *Environmental Defense Fund v. Watkins*, Civil Action No. 91–2929, EDF argues that DOE is precluded from proceeding with the temporary storage of transuranic wastes at the WIPP because DOE has failed to obtain interim status or otherwise comply with the permitting requirements of RCRA. Specifically, plaintiffs contend that because none of the requirements under RCRA's narrow exceptions to the permit requirement have been met, as a matter of law, the WIPP facility must be enjoined from the storage of hazardous waste.[2] Defendants counter that the WIPP does in fact have interim status under RCRA because (1) the WIPP site qualifies for obtaining interim status under RCRA and (2) all of the prerequisites for obtaining interim status have been met by DOE. Thus, defendants argue that DOE may begin its test phase without violating RCRA.

Subchapter III of the RCRA, 42 U.S.C. sections 6921–39b, creates a comprehensive framework for the treatment and disposal of hazardous wastes. The EPA is required to "promulgate regulations establishing such performance standards [for hazardous waste facilities] ... as may be necessary to protect human health and the environment." 42 U.S.C. section 6924(a). Further, a facility must have a permit to treat, store or dispose of hazardous waste. 42 U.S.C. section 6925(a). Finally, a party must comply with EPA performance standards to be issued a permit authorizing construction or operation of hazardous waste facilities. *Id.*

In limited circumstances, RCRA provides "interim status" to parties without permits who meet certain requirements. Specifically, a person who:

(A) [O]wns or operates a facility required to have a permit under this section which facility—

(i) was in existence on November 19, 1980, or

(ii) is in existence on the effective date of statutory or regulatory changes under this chapter that render the facility subject to have a permit under this section,

(B) has complied with the requirements of section 6930(a) of this title, and

(C) has made application for a permit under this section....

42 U.S.C. section 6925(e).

Plaintiffs argue that because WIPP was not in existence when the waste it seeks to manage first became subject to regulation, WIPP was never eligible for interim status. Plaintiffs' Reply to Opposition to Summary Judgment Motion, p. 3.[3]

Defendants assert that neither RCRA nor the Atomic Energy Act ("AEA") specifically address the question of radioactive *mixed* wastes. This is important, defendants assert, because the wastes that will be managed at the WIPP site are composed of a mixture of certain hazardous wastes and certain radioactive wastes. Further, the radioactive part of mixed wastes is subject to the AEA, while RCRA applies to the non-radioactive part. Defendants argue that mixtures of hazardous waste and radioactive waste became subject to RCRA on July 3, 1986 at the earliest. Therefore, defendants argue that WIPP qualifies for interim status because it was a facility in existence when the materials it will manage became subject to RCRA. *See* 42 U.S.C. section 6925(e)(1)(A)(ii). Defendants argue that EPA's clarification that mixtures of hazardous wastes and radioactive

---

**2.** RCRA also provides that the President may exempt federal facilities under certain circumstances. 42 U.S.C. section 6961. This exception is inapplicable here.

**3.** With regard to this argument, defendants concede that the WIPP facility itself was not in existence on November 19, 1980. 42 U.S.C. section 6925(e)(1)(A)(i) is therefore not applicable.

nuclear wastes are regulated by RCRA served as a "regulatory change" for the purposes of interim status under RCRA. 51 Fed.Reg. 24504 (July 3, 1986) and 53 Fed.Reg. 47045 (Sept. 23, 1988). Further, the applicable interim status provision requires a facility to be in existence on the date of a statutory or regulatory change that makes the facility's wastes subject to RCRA. 42 U.S.C. section 6925(e)(1)(A)(ii). Defendants argue that since this clarification was made on July 3, 1986, and served as a regulatory change, this is the date when the wastes that WIPP seeks to manage became regulated by RCRA. Defendants assert that because WIPP was in existence on this date it qualifies for interim status as a matter of law.

With regard to this argument, the Court notes, as plaintiffs point out, that EPA concedes that EPA's treatment of the clarification as a regulatory change for purposes of interim status does not preclude judicial determination on this point.[4] Further it is undisputed that EPA's "notice" and "clarification" about mixed waste, 51 Fed.Reg. 24504 (July 3, 1986) and 53 Fed. Reg. 47045 (Sept. 23, 1988) were not issued pursuant to the Administrative Procedure Act and thus did not create or change RCRA regulations. The Court concludes that EPA's clarification did not serve as a "regulatory change" and does not aid the DOE.

■ The controversy surrounding the question of interim status is thus narrowed to a single question, whether the mixture of hazardous wastes and radioactive wastes was subject to RCRA before the WIPP was constructed. With regard to this issue, it is useful to examine two relevant principles—the "derived from" rule and the "mixture rule". The "derived from" rule provides that "any *solid waste* generated from the treatment, storage, or disposal of a hazardous waste, including

any sludge, spill residue, ash emission control dust, or leachate ... is a hazardous waste." 40 C.F.R. § 261.3(c)(2)(i) (*emphasis supplied*). The "mixture rule" states that "a mixture of *solid waste* and one or more hazardous wastes listed in Subpart D" will itself be a hazardous waste. 40 C.F.R. § 261.3(a)(2)(iv) (*emphasis supplied*). As the Court held in *Chemical Waste Management Inc. v. U.S. Environmental Protection Agency*, 276 U.S.App. D.C. 207, 869 F.2d 1526, (1989), these principles apply with equal force when hazardous wastes are mixed with *non-solid* wastes. Therefore, it follows that when hazardous wastes are mixed with radioactive nuclear wastes they retain their "hazardous" character.

■ The record indicates that there is no dispute as to the material fact of what type of waste the WIPP facility would store. This waste includes: carbon tetrachloride, methylene chloride, tetrachloroethylene, 1,1,1–trichloroethane, trichloroethylene, mercury, xylene, and methyl alcohol. Plaintiffs' Reply, Exhibit A, DOE Final Supplemental Environmental Impact Statement at 5–87, 5–88, and B–29. Further, there is no dispute that these wastes have been regulated under RCRA since November 19, 1980, before the WIPP was in existence. *See* 45 Fed.Reg. 78532, 78543–44 (Nov. 25, 1980), Plaintiffs' Reply, Exhibit B. Therefore, regardless of any compliance with the filing prerequisites for interim status, the WIPP facility could never gain interim status because it was built after the wastes it will manage became regulated by RCRA. 42 U.S.C. section 6925(e)(1)(A)(ii).

For all of the foregoing reasons, the Court will grant EDF's motion for summary judgment on this issue. However, the Court's conclusion that the WIPP does not have interim status does not resolve the issue regarding the Secretary of Interi-

---

4. An EPA memorandum entitled "EPA Guidance re: Interim status" (May 11, 1981) provides: An EPA pronouncement that the facility has met the statutory prerequisites for ·interim status in is essence a statement of opinion which reflects our decision not to take enforcement action against the facility. Such a pronouncement does not ultimately dispose of the issue of whether the facility has interim status. Nor does it preclude a private citizen from forcing a judicial resolution of the issue under the RCRA....
*See* Plaintiffs' Reply, Exhibit C.

or's statutory authority to withdrawal public lands, and therefore is not dispositive of this litigation.[5]

## V.

In *New Mexico v. Watkins*, Civil Action No. 91–2527, defendants argue that as a matter of law, the Secretary of Interior's issuance of Public Land Order 6826 was within his discretionary authority under the Federal Land Policy and Management Act, 43 U.S.C. sections 1701 *et seq.* ("FLPMA").[6] Plaintiff, New Mexico, opposes defendants' summary judgment motion arguing that the issuance of Public Land Order 6826 went beyond the Secretary's authority under FLPMA. *See* 43 U.S.C. section 1714(f). Plaintiff–Intervenors, NRDC, et al., have moved for summary judgment, on this issue.

■ FLPMA specifies the policy of the United States, among other things, that: Congress shall "exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress [shall] delineate the extent to which the Executive may withdraw lands without legislative action. 43 U.S.C. section 1701(a)(4).[7] Further, section 1714(f) of FLPMA provides that extensions of previous land withdrawals may be made *"only* if the Secretary determines that the purpose for which the withdrawal was first made requires the extension." (*Emphasis supplied*). This means that the Secretary of Interior cannot "extend" a

withdrawal of WIPP for a new purpose not required by the purpose of the original withdrawal.

■ Defendants argue that FLPMA was not violated because the Secretary of Interior may lawfully extend and modify a previous withdrawal. Defendants correctly state that FLPMA authorizes the Secretary of Interior to extend and modify existing land withdrawals. Section 1714(a) of FLPMA allows the Secretary of Interior to "make, modify and extend or revoke withdrawals." However, that section emphasizes that the Secretary of the Interior may only modify, extend or revoke existing land withdrawals "in accordance with the provisions and limitations of this section." FLPMA section 1714(a) and 1714(f) illustrate Congressional intent to limit the Secretary of Interior's discretion in making an extension.[8] *See e.g. Mountain States Legal Foundation v. Andrus*, 499 F.Supp. 383, 395 (D. Wyoming 1980) (By passing FLPMA, Congress intended to limit the Secretary of the Interior's discretion in removing large tracts of public land....)

■ Although the scope and duration of withdrawals are within the discretion of the Secretary of Interior, such discretion must be exercised in accordance with the rules and procedural requirements of FLPMA which is subject to judicial review. *Pacific Legal Foundation v. Watt*, 529 F.Supp. 982 (D.Mont.1981). As discussed above, a proper extension of Public Land Order 6403 could only be made if the Secretary determined the original withdrawal necessitated

---

5. As EDF notes, failure to obtain interim status in and of itself need not prevent DOE from opening WIPP after New Mexico grants a permit for the facility. Reply to Opposition to Summary Judgment Motion, p. 12.

6. Defendants also contend that Public Land Order 6826 is a temporary withdrawal and thus FLPMA was not violated. Because the Court finds that FLPMA was violated as a matter of law when the Secretary of Interior exceeded his authority to extend a previous land withdrawal, it need not reach this issue.

7. Under Article IV, Section 3, of the Constitution, "[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States...."

8. It is true, as defendants contend, that there is nothing in FLPMA that expressly states that the Secretary of Interior may not modify and extend a previous withdrawal at the same time. However, under basic principles of statutory construction, a specific provision controls over one of more general application. *Castaneda–Gonzalez v. Immigration & Naturalization Service*, 183 U.S.App.D.C. 396, 564 F.2d 417, 423 (1977). Thus, the specific provision limiting the Secretary's power to extend prior withdrawals controls over the more general provision granting the Secretary power to modify withdrawals. If the Secretary could modify a prior withdrawal with a purpose that directly contradicted the purpose of the original withdrawal without complying with section 1714(f), such specific limitation would be rendered meaningless.

it. The Court finds that this determination could not have been made. The first withdrawal, Public Land Order 6232, withdrew WIPP lands to (1) perform site and design tests for a future Waste Isolation Pilot Plant project and (2) protect the lands pending a legislative withdrawal. The purpose of the second withdrawal, Public Land Order 6403, was to (1) construct the WIPP site, and (2) protect the lands, pending a legislative withdrawal. *Id.* Moreover, the second withdrawal expressed a *limitation* on its purpose, the transportation, storage, or burial of any radioactive materials was not authorized. Notwithstanding the limited purpose of the second withdrawal, the DOE applied for an extension of the second withdrawal which proposed to transport and store nuclear wastes at the WIPP site for a test phase. This extension directly contradicted the purpose of the second withdrawal which expressed that such transportation and storage was not authorized. It therefore follows as a matter of law, that the Secretary of Interior could not have determined that the "purpose for which the withdrawal was first made require[d] the extension." 42 U.S.C. section 1714(f).

Accordingly, the Court will grant plaintiff-intervenor's motion because there are no genuine issues of material fact and as a matter of law, the Secretary of Interior exceeded his authority under FLPMA section 1714(f). The Court will permanently enjoin defendants from proceeding with Public Land Order 6826 issued on January 22, 1991.

## VI.

In conclusion, the Court grants plaintiff's motion for summary judgment in *Environmental Defense Fund v. Watkins*, Civil Action No. 91–2929, and grants plaintiff-intervenor's motion for summary judgment in *New Mexico v. Watkins*, Civil Action No. 91–2527.

An appropriate Order accompanies this opinion.